Jon B. Fougner (State Bar No. 314097)
jon@fougnerlaw.com
600 California Street, 11th Floor
San Francisco, California 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

[Additional counsel appear on signature page]

*Attorneys for Plaintiff Johnathan Threde and the Proposed Class*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| JOHNATHAN THREDE, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GREAT DESTINATIONS, INC.,<br><br>Defendant. | Case No.<br><br>**COMPLAINT FOR INJUNCTION AND DAMAGES**<br><br>**Class Action**<br><br>**JURY TRIAL DEMAND** |

Plaintiff Johnathan Threde, by his undersigned counsel, for this class action complaint against Defendant Great Destinations, Inc. ("Great Destinations"), and its present, former, and future direct and indirect parents, subsidiaries, affiliates, agents, and related entities, alleges as follows:

## I. INTRODUCTION

1. This case arises from Defendant's repeated, unsolicited telemarketing to Plaintiff in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive calling practices, *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 371 (2012).

2. Defendant used an automated telephone dialing system ("ATDS") and a prerecorded or artificial voice, tactics among those that inspired Congress to enact the TCPA and that most infuriate Americans to this day.

3. The telemarketing targeted, among other phone lines, cellular telephones and numbers listed on the National Do Not Call Registry ("NDNCR").

4. Automated telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, and Plaintiff brings this action on behalf of a proposed class of persons—defined more specifically herein—who received such calls promoting Defendant.

5. Plaintiff and proposed class members did not provide prior express written consent to receive these calls.

6. Defendant continues to engage in illegal telemarketing despite having been sued under the TCPA repeatedly.

## II.   PARTIES

7. Plaintiff is a natural person.

8. Plaintiff is a "person" within the meaning of 47 U.S.C. § 153(39).

9. Plaintiff resides in Contra Costa County, California.

10. Defendant is a Nevada for-profit corporation.

11. Defendant's principal place of business is 25510 Commercentre Drive, #100, Lake Forest, California 92630.

12. Defendant's registered agent is GKL Corporate/Search, Inc. at 1 Capitol Mall, Suite 660, Sacramento, California 95814.

## III.   JURISDICTION AND VENUE

13. This Court has personal jurisdiction over Defendant because its principal place of business is in California.

14. This Court has personal jurisdiction over Defendant because Defendant purposefully directed its activities into California by calling Plaintiff (a Californian), while he has in

California, at his phone number, which bears a California area code, and because Plaintiff's claims arise from those activities.

15. <u>Jurisdiction</u>: This Court has federal-question subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. *Mims*, 565 U.S. at 372.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1)-(2) because a substantial part of the events giving rise to Plaintiff's claims—namely, the receipt of the challenged telemarketing—occurred in this District. Moreover, Plaintiff received the robocalls at a phone number bearing an area code from within this District.

17. <u>Intradistrict Assignment</u>: Assignment to this Division is proper pursuant to Civil Local Rule 3-2(c) because a substantial part of the events or omissions that give rise to Plaintiff's claims—namely, the receipt of the challenged telemarketing—occurred in this Division. Moreover, Plaintiff received the telemarketing at a phone number bearing an area code from within this Division.

### IV.    FACTS

**A.    The Enactment of the TCPA and the FCC's Regulations Thereunder**

18. Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1).

19. Calls made by an ATDS or with a prerecorded or artificial voice are referred to as "robocalls" by the Federal Communications Commission ("FCC") and herein.

20. Encouraging people to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

21. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of

1  privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10).

2  22. Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

23. The TCPA's sponsor described computerized calls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall." *Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1044 (9th Cir. 2018).

24. According to findings by the FCC, which Congress vested with authority to issue regulations implementing the TCPA, automated or prerecorded telephone calls are a greater nuisance and invasion of privacy than live-solicitation calls and can be costly and inconvenient.

25. The FCC has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, *i.e.*, that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnote and internal quotation marks omitted).

26. Additionally, the TCPA outlaws unsolicited telemarketing (robocalls or otherwise) to phone numbers on the NDNCR. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2). Encouraging

- 4 -
COMPL. INJUNCTION AND DAMAGES
*Threde v. Great Destinations, Inc.*

people to hold telemarketers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(c)(5).

**B.     The Worsening Problem of Robocalls and Spam Texts**

27. Unfortunately, the problems Congress identified in 1991 have only grown worse in recent years.

28. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

29. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

30. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

31. "During the past fiscal year, the FTC continued to receive many consumer complaints about telemarketing robocalls." Federal Trade Commission, *FTC Releases FY 2019 National Do Not Call Registry Data Book* (Oct. 17, 2019), https://www.ftc.gov/news-events/press-releases/2019/10/ftc-releases-fy-2019-national-do-not-call-registry-data-book (noting the FTC's receipt of 3.8 million complaints about robocalls in its fiscal year 2019).

32. Like other newspapers, *The New York Times* has been writing and reporting on the exploding number of robocall complaints filed by consumers and widespread consumer outrage about illegal telemarketing. Gail Collins, *Let's Destroy Robocalls*, N.Y. Times (Mar. 1, 2019),

https://www.nytimes.com/2019/03/01/opinion/robocall-scams.html; Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

33. The harm from of illegal robocalls is "is at least $3 billion per year from lost time alone." Babette Boliek & Eric Burger, *Beating Back Unwanted Robocalls*, FCC (June 5, 2019), https://www.fcc.gov/news-events/blog/2019/06/05/beating-back-unwanted-robocalls (statement of FCC Chief Economist and FCC Chief Technology Officer).

34. In fact, the wasted hours exceed such time lost outright, because "little surges of the stress hormone cortisol" from interruptions from smartphones result in elevated heart rates, sweaty hands, tightened muscles, anxiety, and distraction, a "switch cost" that weighs on a person even after the interruption ends, reducing his or her efficiency by 40%. Stephanie Stahl, *Constant Interruptions from Smartphone Can Impact Brain Chemistry, Scientists Say*, CBS Philly (May 29, 2018), https://philadelphia.cbslocal.com/2018/05/29/scientists-constant-interruptions-smartphone-impact-brain-chemistry/.

35. Robocalls are overwhelming hospitals and patients, threatening a new kind of health crisis. Tony Romm, *Robocalls Are Overwhelming Hospitals and Patients, Threatening a New Kind of Health Crisis*, Wash. Post (June 17, 2019), https://www.washingtonpost.com/technology/2019/06/17/robocalls-are-overwhelming-hospitals-patients-threatening-new-kind-health-crisis/.

36. Recognizing that the havoc wreaked by unwanted robocalls is spiraling out of control, Congress recently passed, and the President signed into law, legislation strengthening the TCPA. Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act ("TRACED Act"), 116 Pub. L. No. 105, 133 Stat. 3274 (amending 47 U.S.C. § 227).

C.  **Defendant's Role in This Growing Problem**

37. Defendant calls numbers even though they are assigned to cellular telephone services.

38. Defendant calls numbers even though they are listed on the NDNCR.

39. Recipients of these calls, including Plaintiff and proposed class members, had not provided prior express written consent to receive them.

40. Defendant's calls at issue were not necessitated by an emergency.

41. Defendant's calls at issue were made to numbers within the United States.

42. Violating the TCPA is profitable for Defendant.

43. Defendant has been sued repeatedly under the TCPA. *E.g.*, Compl., *Kaufman v. Great Destinations, Inc.*, Case No. 3:19-cv-01459-DMS-KSC (S.D. Cal. Aug. 4, 2019), ECF No. 1; Compl., *Jensen v. Great Destinations, Inc.*, Case No. 5:14-cv-02031-JGB-DTB (C.D. Cal. Sept. 30, 2014), ECF No. 1.

44. For every 18 million robocalls, there's only one TCPA lawsuit in federal court. *Compare* Mike Snider, *Robocalls Rang up a New High in 2019. Two or More Daily Is Average in Some States*, USA Today (Jan. 15, 2020), https://www.usatoday.com/story/tech/2020/01/15/robocalls-americans-got-58-5-billion-2019/4476018002/ (58.5 billion robocalls), *with* WebRecon, *WebRecon Stats for Dec 2019 and Year in Review: How Did Your Favorite Statutes Fare?*, https://webrecon.com/webrecon-stats-for-dec-2019-and-year-in-review-how-did-your-favorite-statutes-fare/ (last visited Mar. 25, 2020) (3,267 TCPA complaints).

### D. Defendant's Telemarketing Robocalls to Plaintiff

45. Defendant sells timeshares.

46. Plaintiff is the owner, payor, and user of a phone number that begins "(925) 963." The calls to him described herein were to that number.

47. Defendant called Plaintiff.

48. Defendant called Plaintiff 10 times.

49. Defendant called Plaintiff on February 5, 2020.

50. Defendant called Plaintiff while transmitting the caller ID (925) 332-1412.

51. Defendant called Plaintiff using an ATDS.

52. Defendant called Plaintiff using an artificial or prerecorded voice.

53. The artificial or prerecorded voice instructed Plaintiff to press "1" if interested in a travel deal.

54. Defendant called Plaintiff in order to sell Plaintiff timeshares.

55. Defendant called Plaintiff 10 times on February 5, 2020, while transmitting the caller ID (925) 332-1412, using an ATDS and an artificial or prerecorded voice in order to sell Plaintiff timeshares.

56. Plaintiff answered three of Defendant's calls on February 5, 2020.

57. At 12:01 a.m. on February 6, 2020, Defendant emailed Plaintiff instructing him to come to Defendant's office at 4234 Hacienda Drive, Suite 101, Pleasanton California 94588.

58. Plaintiff is not and has never been a customer of Defendant.

59. Plaintiff has never provided prior express written consent to receive Defendant's calls.

60. Others have reported receiving telemarketing from Defendant showing the caller ID (925) 332-1412. *925-332-1412*, 800Notes (Mar. 12, 2020), https://800notes.com/Phone.aspx/1-925-332-1412 ("Called me twice on 2 separate days and never left a message. Called on another day and when i answered it was someone stating they are from 'great destinations'.").

**E.   Defendant's Autodialing**

61. Predictive dialers can dial thousands of numbers at once, and only transfer each call to a live agent once a human being is on the other end.

62. As a result, the telemarketer shifts the burden of wasted time from itself to the calls' recipients.

63. A predictive dialer is an ATDS.

64. Some of Defendant's marketing strategies involve an ATDS.

65. Defendant uses equipment that has the capacity—(1) to store numbers to be called or (2) to produce numbers to be called, using a random or sequential number generator—and to dial such numbers automatically.

**F.   If the Calls Were Made by a Third Party, Then Defendant Is Vicariously Liable for Them**

66. For more than twenty years, the FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any

violations." *In re Rules and Regulations Implementing the Telephone Consumer Protection Act*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

67. In 2008, the FCC likewise held that a company on whose behalf a telephone call is made bears the responsibility for any violations.

68. The FCC has instructed that sellers may not avoid liability by outsourcing telemarketing to third parties, warning that

> allowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment, limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because "sellers may have thousands of 'independent' marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy."

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnotes and alteration marks omitted).

69. The FCC held that a corporation or other entity that contracts out its telephone marketing "may be held vicariously liable under federal common law principles of agency for violations of either section 227(b) or section 227(c) that are committed by third-party telemarketers." *Id.* at 6574 ¶ 1.

70. Defendant retains third-party vendors to telemarket its goods and services to customers as well as non-customers who do not have an existing business relationship with Defendant.

71. Defendant is vicariously liable for its telemarketers' TCPA violations.

72. Defendant could have restricted its telemarketers from using automated telemarketing, but it didn't.

73. Defendant knew or reasonably should have known that its telemarketers were violating the TCPA on its behalf and failed to take effective steps within its power to force them to cease that conduct.

74. A reasonable seller that accepts automated telemarketing call leads from lead generators would, and must, investigate to ensure that those calls were made in compliance with the TCPA and regulations promulgated under it.

75. Defendant exercised interim control over its telemarketers.

76. Defendant has the power to require all third parties that make telephone solicitations at its request and under its direction to:

    a. institute procedures for maintaining a list of people who do not wish to receive telephone solicitations (a "do-not-call list");

    b. scrub all leads against this do-not-call list before initiating any telephone solicitations;

    c. when applicable, scrub against required state and federal "Do Not Call" registries;

    d. institute and maintain a procedure to capture all do-not-call requests and transmit them daily to Defendant;

    e. develop a written policy implementing a requirement to keep a do-not-call list and make this written procedure available to anyone on demand;

    f. maintain a do-not-call list for 10 years and refrain from selling or sharing the do-not-call list (except with a subsidiary or affiliated company) without customers' consent;

    g. train and inform personnel engaged in any aspect of telephone solicitation in the existence and use of a do-not-call list;

    h. provide the called party with the name of the individual caller, the person or entity on whose behalf the call is made and a telephone number or address at which that person or entity may be contacted;

    i. make a record of the name and telephone number of Defendant's customer or prospective customer who requests not to be called again and forward such record to

1  Defendant daily, to the party maintaining the vendor's do-not-call list, and to affiliated entities;
2  and
3     j. place consumers' names and numbers on the do-not-call list of any
4  affiliate of the telemarketer where the customer would reasonably expect to be included on such
5  list given the identity of the telemarketer and the good or service being advertised.

### G. The Harm Caused by Defendant's Automated Telemarketing

77. The conduct alleged herein:

  a. invaded Plaintiff's and proposed class members' privacy and solitude;

  b. interrupted Plaintiff's and proposed class members' train of thought;

  c. wasted Plaintiff's and proposed class members' time;

  d. annoyed Plaintiff and proposed class members;

  e. harassed Plaintiff and proposed class members;

  f. consumed the battery life of Plaintiff's and proposed class members' cellular telephones;

  g. induced in proposed class members surges of the stress hormone cortisol, resulting in elevated heart rates, sweaty hands, tightened muscles, and anxiety; and

  h. cost some proposed class members money, either outright or in the form of spent minutes in a limited-minute monthly cellular service contract.

## V. CLASS ACTION ALLEGATIONS

78. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this case on behalf of a class defined as follows: All persons in the United States to whom:

  a. one or more calls (including text messages) were made;

  b. to a cellular telephone number;

  c. that could have promoted Defendant's goods or services;

  d. using an ATDS or an artificial or prerecorded voice;

  e. between the date four years before the filing of the original complaint in this case and the first day of trial.

1   Notwithstanding anything herein to the contrary, excluded from the class are Defendant, any
2   entity in which Defendant has a controlling interest or that has a controlling interest in
3   Defendant, Defendant's legal representatives, assignees, and successors, the judges to whom this
4   case is assigned, and the employees and immediate family members of all of the foregoing.

79. Plaintiff is a member and proposed representative of the class.

80. The class is identifiable through phone records and phone number databases.

81. The class is so numerous that joinder of all its members is impracticable.

82. The class numbers in the thousands, or more.

83. Sending a robocall costs less than one cent.

84. Defendant could afford to, and did, send thousands of robocalls.

85. Outcome-determinative questions of fact and law have the same answers for all class members.  These questions and answers include but are not limited to the following:

    a.    Did Defendant call the class member at a cellular telephone number?  (Yes.)

    b.    Did Defendant call the class member using an ATDS and/or an artificial or prerecorded voice?  (Yes.)

    c.    Was the purpose of the calls to the class member telemarketing?  (Yes.)

    d.    Were the calls to the class member necessitated by an emergency?  (No.)

    e.    Did Defendant call the class member on one or more dates such that the class member had a TCPA claim that was not time-barred on the date that the original complaint in this action was filed?  (Yes.)

    f.    Had the class member provided prior express written consent before being called?  (No.)

    g.    What is the minimum statutory damages per violation the class member is entitled to?  ($500.)

    h.    Were Defendant's violations of the class member's rights under the TCPA knowing and willful?  (Yes.)

1          i.      How much in statutory damages per violation should the Court award the
2   class member?  ($1,500.)

3          j.      Should Defendant be enjoined?  (Yes.)

4      86. The foregoing common issues predominate over any individual issues, making a class action the superior means of resolution.  Adjudication of these common issues in a single action has important advantages, including judicial economy, efficiency for class members, and classwide *res judicata* for Defendant. Classwide relief is essential to compel Defendant to comply with the TCPA.

87. Plaintiff's claims are typical of the claims of the class.  Plaintiff's claims and those of the class arise out of the same automated telemarketing by Defendant and seek the same legal and equitable remedies.

88. Plaintiff will fairly and adequately protect the interests of the class.

89. Plaintiff has retained competent and capable counsel experienced in TCPA class action litigation.

90. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so.

91. The interests of Plaintiff and his counsel are aligned with those of the proposed class.

92. The interest of individual members of the class in individually controlling the prosecution of separate claims against Defendant is small because the damages in an individual action (up to $1,500 per TCPA violation) are dwarfed by the cost of prosecution.

93. The forum is a desirable, efficient location in which to resolve the dispute.  Plaintiff lives in the forum.  Defendant is headquartered in California.  The forum is on the cutting edge of managing class actions.  Within the forum's district and magistrate judges can be found experience in managing TCPA class actions, including motion practice, class certification, discovery, ADR, and trial.

94. No significant difficulty is anticipated in the management of this case as a class action.  Management of the claims at issue is likely to present significantly fewer difficulties than

are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

95. Defendant has acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief appropriate on a classwide basis.

## VI.   FIRST CLAIM FOR RELIEF
### (Violations of the Telephone Consumer Protection Act, 47 U.S.C. § 227(b)(1)) On Behalf of Plaintiff and the Class

96. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

97. Defendant violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to the cellular telephone numbers of Plaintiff and members of the class using an ATDS and/or artificial or prerecorded voice.

98. Plaintiff and class members are entitled to an award of up to $1,500 in damages for each knowing or willful violation and of $500 for each other violation.  47 U.S.C. § 227(b)(3)(B).

99. Plaintiff and class members are entitled to and seek an injunction prohibiting Defendant and all other persons who are in active concert or participation with it from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency calls to any cellular telephone number using an ATDS and/or artificial or prerecorded voice.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of all class members, prays for judgment against Defendant as follows:

A.   Certification of the proposed class;

B.   Appointment of Plaintiff as representative of the class;

C.   Appointment of the undersigned counsel as counsel for the class;

D.   A declaration that actions complained of herein violate the TCPA;

E.   An order enjoining Defendant and all other persons who are in active concert or participation with it from engaging in the conduct set forth herein;

1  F. An award to Plaintiff and the class of damages, as allowed by law;

2  G. An award to Plaintiff and the class of costs and attorneys' fees, as allowed by law,

3  equity and/or California Code of Civil Procedure section 1021.5;

4  H. Leave to amend this complaint to conform to the evidence presented at trial; and

5  I. Orders granting such other and further relief as the Court deems necessary, just,

6  and proper.

## VIII. DEMAND FOR JURY

Plaintiff demands a trial by jury for all issues so triable.

## IX. SIGNATURE ATTESTATION

The CM/ECF user filing this paper attests that concurrence in its filing has been obtained from its other signatories.

RESPECTFULLY SUBMITTED AND DATED on April 1, 2020.

By: */s/ Jon B. Fougner*
Jon B. Fougner

Anthony I. Paronich, *Pro Hac Vice Forthcoming*
anthony@bparonichlaw.com
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
Telephone: (617) 485-0018
Facsimile: (508) 318-8100

Andrew W. Heidarpour, *Pro Hac Vice Forthcoming*
AHeidarpour@HLFirm.com
HEIDARPOUR LAW FIRM, PPC
1300 Pennsylvania Ave. NW, 190-318
Washington, DC 20004
Telephone: (202) 234-2727

*Attorneys for Plaintiff Johnathan Threde and the Proposed Class*